May it please the Court, my name is Tom Davis and with me at the Council table is Ms. Courtney Harrison is with us on the briefs. We're with the Stinson Law Firm in Kansas City and Ms. Harrison and I both participated in the trial in this case in December of 2021. We're here in a cross appeal. Northwestern's appeal concerns two issues. The first issue is one involving what we call regulatory impossibility. Whether in this case the decision of the Montana Public Service Commission suspending the tariff rate was an impossibility, governmental impossibility, that interfered with the performance of these contracts. The second issue has to do with lost profits or damages claim by the plaintiff which we say is excluded under the very language of the power purchase agreements in this case. The brief actual background I want to lay is that the parties had been negotiating these power purchase agreements in the spring of 2016. At the same time there had been somewhat of a rush on small solar in Montana and the costs, the of kilter. So Northwestern Energy applied for emergency suspension of the then existing tariff rate and at the time it applied for that rate and at the hearing it recognized that there were some agreements that were in process and it asked to accept those agreements from the suspension including the four power purchase agreements that are issued in this case. And despite that, the Montana Public Service Commission entered its initial order, emergency suspension, and then reaffirmed it several times later. It said the old tariff rate is unavailable to you unless you have both a power purchase agreement, which they did, and an interconnection agreement, which they did not. And so that suspended the old tariff rate for these power purchase agreements. The parties did attempt to get the Montana Public Service Commission to change their mind, including a joint request to to change that order with respect to the application to these power purchase agreements and that was denied. What I understand that the Commission was saying is that they didn't need to because their suspension order has no effect on an existing contract and they think that the statutory scheme contemplates that existing contracts, once they lock in a rate, you know, if the avoided rate, the official one, changes after that, that doesn't negate the contract. So what can you point to that suggests that somehow, you know, a post-execution change in the rate would negate, you know, would invalidate an existing contract? Well, I have two things to say in response to that is that they did have the opportunity to appeal the Commission's decision under the then existing statutory construct and if they wanted to appeal, to make that position to Montana State District Court that the Commission did not have the power to alter those contracts, then they could make that case to the State Court of Appeals and they chose not to. Instead, what they did is they filed a suit for breach of contract in, which became a breach of contract case in federal court and then, then the issue becomes somewhat of an as-applied challenge problem. If they're going to take the position that the Montana Commission did not have the power to interrupt these contracts, then that's something that is an as-applied challenge. It calls into the question of the jurisdiction of this court to make that decision. Our position is that regardless of whether or not the Commission was correct, it did interrupt these agreements. It said you cannot pay the old tariff rate and therefore, the position of Northwestern is that, well, we're being told by a regulator we can't pay this rate anymore. That works an impossibility of performance for us when it comes to, you know, abiding by the dictates of our regulator. And so, it doesn't under the restatement that we cite under impossibility, the restatement 264 and some of the cases interpreting it that we cite, it doesn't really make a difference whether the regulator is correct, you know, when it tells, in this case, the utility that you can't pay this rate anymore, that there is an appeal process to correct that or not. They elected not to follow that appeal process. And so here, we're just here on a straight breach of contract claim. Did that work an impossibility of performance or not? I guess one of my questions is why does it make sense to interpret the Commission's rate suspension order as applying to the four fully executed contracts when we, in fact, know the Commission is aware that it lacks authority over fully executed contracts? I'm sorry, I didn't totally hear your question. I know that you're arguing impossibility on the contract, but I'm not sure it makes sense to interpret the Commission's rate suspension order as applying to the four fully executed contracts when we, in fact, know the Commission is aware that it lacks authority over fully executed contracts. The Commission does state that we do not get involved in contract disputes. And so, but at the same time, the Commission is very clearly saying, because they were asked a couple of times to change their mind, that you cannot pay these rates on, for these contracts. And so, while on the one hand, it wants to say, you know, we're not going to get involved in contract disputes, on the other hand, they clearly are precluding the key performance metric on the contract, which is the price, the tariff rate of the price. And from our standpoint, that gets us to Section 28.2.603 Montana Code annotated, if the object of the contract is illegal, here the price, that makes the contract void. And so, that's where we're coming from with that. There's, the Commission does have this kind of stock language that we don't involve ourselves in contract disputes, but the reality is, when they say you can't pay the price, they have nullified the key determiner of the contract. Well, you mentioned before that Pacific Northwest Solar could have appealed from that. Could Northwest Energy have appealed from that? If you're saying, we wanted to comply with these contracts, but the Commission kept telling us that we couldn't pay this rate, we asked them repeatedly, why didn't you appeal from that? Well, I think, to answer your first question, is I do think that both sides could have appealed. They could have, and the appeal process would have been to name the Commission as a party to the appeal and pursue the appeal in state court. From the utility standpoint, they're basically following the dictates of the regulator, so their incentive to appeal is not as great as the other side, where they say that the decision was wrong and we should be having those contracts honored. They're here basically saying the same thing, that those contracts should have been honored. If they wanted to pursue that action, they should have pursued that appeal. But didn't the Commission itself state that any dispute should be viewed as a contract issue to be resolved in the appropriate court? It seems like that refutes your assertion. They did say that, and the way I would look at it is this is a very contract dispute that is being presented to you all, and so one of the defenses to a contract dispute is whether there is this regulatory impossibility. But your defense is regulatory impossibility based on a Commission decision that you could have appealed but chose not to. Yes, that's correct. We could have appealed that decision. The utility elected not to do that, and so did... And your position is that it was wrong, and it's only because it's the only reason why you couldn't perform, but you chose not to appeal it. That's correct. It became, in that sense, it became a final decision, but it became a final decision saying you can't pay those rates. So... Can we talk about lost profits? Sure. I guess my question is, is it your position that any lost developer fee is lost profits by another name, or just that lost developer fees, as presented to the jury in this case, were lost profits? It's the first. In other words, the exclusionary clause in the Power Purchase Agreements is actually broader than just lost profits. Either party shall be liable to the other for consequential, incidental, indirect damages, and then it goes on and includes lost profits in that list. Now, lost profits... I just want to say, if your contention is that a lost development fee is just the same thing as lost profits by another name, how do you deal with court decisions saying there is a legal distinction between those, and a factual distinction between a lost development fee and lost profits? Our position is that, regardless of what you call it, whether you... I mean, they called it lost profits in their opening statement. They said, we're going to be seeking damage for these developer fees, which are lost profits. Our position is that, regardless, it's indirect damages. They're not direct reliance damages. They put on a case, to some extent, starting to lay the foundation for direct reliance damages by saying... I mean, I'm having a hard time with that, because at the district court, you didn't bring that up, right? I mean, this was a federal trial, and so there's advanced disclosure of experts. You knew what their expert was going to say. You knew what their theory of damages was, and yet you never brought up to the district court, this is improper. This is not allowed. In fact, you made other statements to suggest that your client recognized the difference between lost profits and developer fee, and said that lost profits aren't okay, but developer fees are. And in addition to that, presented your own witness, expert, that talked about developer fees and how you calculate them, and whether they're appropriate. So it seems like you're should we allow that? Well, I will say it's not a new argument on appeal. We did say in our pre-trial statement that we believed that the plaintiff could not obtain consequential damages, including lost profits. So that was stated in advance. The trial court did allow us, basically, to defend and put on evidence, including the exclusionary clause, in the agreement. There was a debate. There was basically a trial. Part of the trial was about, are these lost profits or are they not? I understand that lost profits was argued about, but I guess my question to be more specific is, did you ever tee up to the district court that developer fees are improper lost profits? We did not make any kind of pre-trial motion to that effect. We did not file a motion for some re-judgment to that effect. Or even during trial? In trial, we just tried the case. We tried the evidence. We put on the power purchase agreements were an exhibit in trial, and we pointed out to the jury. So when Pacific's expert got up and testified, this is the measure of damages and this is how I've calculated them, there is no objection from your client on the record saying this is improper and irrelevant evidence. That's correct. We just cross-examined him to try to demonstrate that this was lost profits. And isn't it true that now on appeal, you're making that argument? You're making the argument that none of that evidence was relevant and ever should have presented because it's a category of damages that's not recoverable. That's correct. Based upon the evidence that came out at trial, we believe that, and this is part of the post-trial motion we demonstrated, that it was lost profits. Are you saying that the evidence as it came out was a surprise to you from what they disclosed? I'm saying yes, in a sense, because they were never clear on how they were calculating their developer fee, and they themselves changed their terminology between lost profits and the developer fee. So that's what led to the uncertainty about that. So if the instruction was erroneous here, and I think you're arguing that it was, because lost profits should have never been presented, I'm just trying to understand whether or not that was harmless error at this point, and I'd like for you to give me your best argument on why it was. Well, our argument is that... Especially in light of the questioning that Judge Forrest just conducted. I understand. The argument is that it shouldn't have been allowed as a matter of law. We're not seeking a... What shouldn't have? When you say it... The instruction that included lost profits. If the jury was allowed to make a decision that what they were not really claiming was lost profits, then that instruction would be allowed. So we're not asking for a new trial on that basis. We're asking if the determination is that that was what it was, it was lost profits, or some other consequential damage, then it would be excluded as part of the contract. Can I go back then to what I think was Judge Forrest's question, because I'm confused now again as to your position. Are you contending that as a matter of law, in fact, there is no difference between lost profits and development fees? Are you contending that... Are you acknowledging that there's a difference, right? That there's lost profits are measured one way, developer fees are measured another way, developer fees do account for some kind of lost profit calculation, but then there's a discounting for risk and so on. But that at trial, what was actually presented in terms of evidence was only in the lost profits and not in the development fees. I guess what exactly is your position? Our position is that there can be a difference between lost profits. There can be a difference between a direct damage developer fee, but the way it ended up getting presented was that it was lost profits. And the way that they ended up putting on their expert, it became lost profits, although they tried to call it something else. And so that's... And no matter what, it's indirect or consequential. It's not a direct damage. And so even beyond lost profits, it would be precluded under the terms of the PPA. And I guess I would ask, what are you specifically pointing to in the record? Because my understanding of the record is that there was expert testimony from both parties about what the developer fees were, and they were drastically different numbers. But both sides were purporting to have expert testimony on what the developer fee would have been, right? And then the jury was charged with basically determining which expert's testimony they credited. And I didn't see anything that said this was... An expert testimony was saying this is what the lost profits number would have been. This is what the developer fee would have been. I think your reading is correct. It was muddy. But with the way that the plaintiff put it on was a feature of lost profits because they were projecting the revenues, and it's part of cross-examination of Mr. Lynch, their expert, as to how he was coming up with it. But isn't projecting revenues a legitimate part of the developer fee calculation? So just saying they did some kind of profit calculation, I think doesn't really answer the question because they were entitled to say, in order to determine what the developer fee was, we had to do some kind of lost profit calculation, and then we had to do steps B and C, right? Yes, that's right. But when you're getting down to it, the projection of revenues, less expenses, yielding a fee becomes a lost profit at that stage of the development. If I could reserve a minute. Yes, sure. Good morning, your honors. May it please the court, Trent Gardner on behalf of Pacific Northwest Solar. On the appeal case, it's a very simple issue. We're dealing with four fully executed contracts. There is not an order from the MPSC saying that Northwestern cannot perform on these four fully executed contracts. Your honor asked a direct question. Where is it in the order where it says we cannot perform on these four fully executed contracts? There was no response. There was no site to any specific language. And interestingly, I read all of Northwestern's briefs, and there is not a single site in those briefs to the actual language of the notice of perform or the language of order 7500 showing why they can't perform. They repeatedly say it's explicit. They specifically said we cannot perform. It's simply not true. If you go to the notice of committee action and look at it, it is 3 ER 414 to 415. The operative language is on the second page, and it states, Northwestern is explicitly authorized following issuance of this notice to execute contracts with solar QFs greater than 100k but no larger than 3 milliwatts at the standard tariff rate if prior to the date of this notice the QF had submitted. So the QF had submitted a power purchase agreement, but Northwestern hadn't signed it and executed an interconnection agreement. And that's the legally enforceable obligation standard. Let me ask you, the commission suggested at times that the rate suspension order applied to the four contracts, including stating that it does not matter for the purposes of the suspension whether the contracts here were considered fully executed or not. The projects did not meet the harbor provisions for QF standard rates. So I'm just trying to reconcile this language with your arguments that the order did not even apply to the contracts. So the language the chief judge cites is in 7500D, and it's under the heading discussing, because they were still Pacific and Northwest were still arguing, hey, these are four fully obligation. And so the language cited by the chief judge is in that discussion of whether they met the safe harbor provision for the legally enforceable obligation. And the PSC says, no, you did not meet that safe harbor provision to be an LEO. However, they immediately move on to say, we have no jurisdiction over fully executed contracts. That's an issue for the state court. Well, I guess if the rate suspension order so clearly did not apply to the fully executed contracts, I'm just trying to figure out why did Pacific and then the parties jointly move the commission for relief from the order? Because Pacific, after the notice of commission action, that's June 16th of 2016, Northwestern says, we're not going to perform these four fully executed contracts, despite no language in there. Then order 7500 comes out a month later. And I think in the progression to 7500D, which the chief judge just cited, I think it's important to look at some specific language from 7500. But to answer your question, the reason for 7500D was because Northwestern insisted on reading the notice of commission action and order 7500 in an impossible manner. It didn't say they couldn't perform, and legally they could not have said they couldn't perform. And I don't think there's any dispute about that. But in order 7500, and this is at 3ER28, it's page 13 of that order, the PSC states, Northwestern's motion does not address the have made sufficient commitments to deliver energy and capacity to warrant excluding them from the effect of the suspension, despite not having a fully executed contracts with Northwestern. And then the commission goes into the test for the LEO, which says you have to have submitted an agreement and have a signed interconnection agreement. And so I think that language there, and then reading down below, they talk about the safe harbor, and to establish an LEO, you need to have submitted a contract and have an interconnection agreement. But they preface all of that with saying, this is for people who don't already have fully executed contracts. I just have a practical question here because I'm just trying to figure out this story and how it unfolded. Did your client know that Northwestern was challenging the rate when it executed the contracts? That Northwestern was seeking to suspend the rates? Yes. At the time it, this had been a very long process of my client trying to get these agreements signed. At the time it executed, because when they finally did execute it on June 2nd, yeah, the motion to suspend the tariffs had been filed by Northwestern. That's the thing that I remember, I've just been scratching my head about this case, is that Northwestern challenges the rate. And then a couple of weeks later, everybody signs the contracts. And the commission agrees to suspend the rate less than a month after Northwestern makes the request. And so it's like, why didn't we wait and see what was going to happen with the rate? Or why didn't you build into the contract, whatever the prevailing rate is, what we'll pay instead of specifying? Again, I'm not sure it matters, but as a practical matter, I cannot figure out why we're just going along with a contract when we just, a couple weeks ago, said this price is wrong. Because Northwestern has an obligation to purchase power. And Pacific had many other projects that were in various stages. Some that were submitted, signed, and Northwestern hadn't signed. But the fact is, on these four contracts, and that's why we're here talking about these four contracts, is Northwestern signed them before the notice of commission action. It wasn't a surprise to your client that this rate was being challenged? No, I don't believe so. And I don't believe that matters. You heard a comment about appealing, and that Pacific should have appealed this order from the PSC. There was nothing to appeal. The PSC didn't order Northwestern to not perform. And so the idea that Pacific needed to appeal is just wrong, because the order didn't preclude Northwestern from performing. And I think I took a very long-winded way around to answer your question. And so the reason for the reconsideration was Pacific was forced to try to get Northwestern to perform, despite the order not saying it could not. I'd like to move on to loss of profits, but I guess in simple terms, how would you define a developer fee? And how is a developer fee calculated? I'm going to go to Northwestern's definition of a developer fee. And this was in Northwestern's post-trial briefing, where it argued and submitted briefing on this loss of profits issue for the very first time, because Northwestern never raised it in the pretrial order. Every court in the country rules that an issue that's not raised in a pretrial order is waived. It's not available. And it's specifically for the purpose of preventing surprise like this. And as Northwestern says, this is a legal contract issue. This should have been resolved before trial, or at a minimum, raised before trial. Northwestern, in arguing that it hadn't waived this defense post-trial in its briefing, stated that, in other words, it was clear that prior to trial, the plaintiff was of the project. Nothing in either the first amended complaint or the amended pretrial order suggested that plaintiff was seeking lost profits. And in general, I agree with that assessment that a developer fee is different than lost profits, and it's essentially the fee they would have earned on putting the project together and selling it. And so post-trial, Northwestern argued developer fee, lost profits, two different things in order to avoid the waiver issue. Now on appeal, they're claiming they're the same thing. And I think on the lost profits issue, this is extensively briefed, but I think one, it's clearly waived. What's the best case to support your position? I guess what I'm hearing is that loss, that a developer fee is distinct from lost profits. That's your position. I don't think they're necessarily equatable. I think when the provisions in that contract talking about lost profits, courts have interpreted those provisions in various ways, and so I think it's talking about incidental lost profits from a breach down the road, whereas if what Pacific claimed is not recoverable, and if this provision is read the way they say it should be read, Northwestern breached this contract shortly after it signed. I'm not sure you're answering the question. So I think we're asking, what is your of calculation for the developer fee or the value of the contracts that they had been sold versus your definition or how you would calculate lost profits? So what is the difference in how those two things are calculated, if any? I don't know that I have a definition of would be under this contract. You operate for 25 years, and this is how much profits you could make on that, whereas the developer fee, the idea behind this was to put together the project, get it to a point where it could be sold, and it was essentially a fee for what they'd done on that. Well, so it's interesting because if you're saying they're equatable, that's what I'm hearing, they're the same, then even if the even if, that's what I'm hearing you're saying, even if the instruction was erroneous, why isn't it harmless? The instruction that the jury could award lost profits? Right, when it couldn't, according to the contract. I do not believe the contract, the type of damages that Pacific claimed, I do not believe that precludes those damages. But the instruction said lost profits, other damages, other harm caused. And, you know, certainly post-trial, Northwestern took the position that what was claimed at trial was not lost profits and therefore not precluded by the contract. But I think it would be harmless. Go ahead, it would be harmless? I think it would be harmless error, their position that including the lost profits in that jury instruction, because the jury instruction says you can award damage caused by the breach of the contract, including lost profits, other harm, other injury. Was there ever an argument by Northwestern, I suppose maybe it would be in their closing argument, that the client presented evidence on was not recoverable because it was lost profits? I guess I have to, I have answered my own question because with the instruction being that lost profits, that idea was incorporated in the instructions, there wouldn't have been an argument about that. So instead of closing argument, was there ever an argument to the court about that? I believe that was briefly addressed after opening argument. No, I'm saying after the evidence, after your expert evidence on damages comes in, and the other side has said, well, they were sort of surprised how the evidence came in. After the evidence came in, was there ever an objection or an argument made to the court that the evidence was describing a type of damages that couldn't be recoverable? From Northwestern? I believe it may have been raised. I don't know off the top of my head, specifically if it was where it was raised. I have one other follow-up question that's sort of unrelated and sort of related to some of the questions the Chief was asking. I just have a question, follow-up as well. In discussing lost developer fees, didn't witnesses or did they refer to lost future revenue and the power projects that would generate over time? Just in my review, I'm just trying to figure out, is that considered lost profits or would you consider that to be lost profits? Lost future revenue? If there was a reference to, I guess, lost future revenue could be considered a form of lost profits, I guess. Well, if that is the case, then I'm trying to figure out, and we have to look at the what's your position on that? Well, my position is first that I do not believe the contract excludes all lost profits. There's case law out there interpreting a very similar provision where that lost profits is included in that list of incidental consequential damages and interpreting that as being incidental, not direct lost profits. That's my follow-up question. I mean, to boil this down a little bit, you can have the benefit of the bargain, the benefit of this contract, and we could call that lost profit because you're going to profit from the contract, or you can have lost collateral business benefits as a result of this breach, and that happens all the time in all kinds of different industries. Is your argument that both of those things are or only one of those categories? No, and I think we made this argument in our brief. As your Honor says, there's a difference between incidental and direct, and if you want to equate developers' fees or lost profits, we're talking about direct damages stemming from the very purpose of this contract, and if those are precluded here by the language of the contract, which I don't think they are, then I think that clause is essentially unenforceable because... But you said that there's case law that says that that kind of direct business loss is not lost profits in a contract where lost profits is in a provision that's consequential and incidental, whatever. Are those cases in your briefs? Yes, they are. There's... I can't remember the exact page or the name of the cases off the top of my head. I apologize. And what's your best case to support that position? Can I grab that? I believe the best case on, I think, nearly identical language is Henry Buffalo Coal. That's a bankruptcy northern district of West Virginia. The case of very instructive of the language. I apologize. Make sure you understand because I don't think you cited the correct standard of review on the instruction in your brief, or if you cited it at all, I can't remember. But if we determine that the contracts preclude all forms of lost profits and the district court erred in giving lost profits during instructions, it seems, based on my understanding of the standard, we have to presume prejudice and shift the burden to Pacific to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been erred. Because Pacific's witnesses talked in terms of developers fees and what they would have made on the sale of the project, which is not lost profits. Even if we were talking about direct lost profits, that's the lost profits made on the contract in the future. The sale of the project, when getting it to the point where it's saleable, is not lost profits. And Pacific's witnesses testified in terms of developers fees and what that value would be, and that that is not lost profits. And there was substantial evidence to support that those were developer fees. And the jury instruction did not only say lost profits. It says you were all damaged flowing from that. And this goes back to my question, which I'm still not sure you answered, which is in, can you clearly define what is the difference in terms of how lost developer fees are calculated versus how lost profits are calculated? Lost profits, I believe, would be the lost profits you would make if, because the contract is a power purchase agreement, you get to buy power at this price for the next 25 years. And so the lost profits would be the loss of those profits over that 25 years from operating that. The developer fee is essentially the fee they make for putting it together and selling the project to somebody else to put it together and then recoup those lost profits. I think that's the difference. Okay, and how is the developer fee set? How is it calculated? It's basically calculated on the value of the project and what people think the project would be worth. And does that market inherently include future and therefore profits? Future financial gain and therefore only, and that's only considered profits, or is there something else there? I'm sorry to interrupt on you. I think there's various factors of people that go into the calculation. I certainly think what somebody would be willing to pay, that would certainly include what they think they may make in the future off it. Any concluding statement? I did not even get to our cross-appeal. You're right. On our cross-appeal, Pacific was prevented from presenting its damage case at trial. It was cast as a speculator who didn't get anywhere on these contracts. And the court's pretrial ruling excluding all other projects, which was completely unsupported and not even asked for the refusal to give jury instruction 35. And the way the trial went in and what was done at trial, I would just briefly say gave them no shot at proving their realistic damages. Thank you. Thank you. We took your friend over, so I'll give you two and a half minutes. Thank you, Judge. I want to respond quickly about a record, the question about the record. We did raise the objection to lost profits in trial in a Rule 50 motion. And I also objected to the instruction, that's at 4 ER 916, where I am objecting to the jury instruction that contained the lost profits and incorporating our Rule 50 motion as part of that objection. With respect to the comment about the commission orders, I would like to point out that it is important to consider, especially with respect to the last commission order, 7500 D, what the relief was that was requested jointly, which was to accept these four contracts, these four projects from the prior order of suspension. That was the relief that was requested specifically to carve these things out. And that is the relief that was denied. My understanding is the commission said it's denied because it's unnecessary. It seems to me that you're insisting on interpreting the commission's orders as essentially ultraviarious, that they were going beyond their authority to interfere with an existing contract. And the commission keeps saying, we don't have the authority to interfere with an existing contract, so we don't understand why you're asking for this relief. That, I would say, is not really what was going on in those orders. There was all this analysis of the LEO standard and whether there was existing contract standards. And ultimately, though, the commission basically just said, you don't have what our order requires, which is you don't have the interconnection agreement. And we're not going to reconsider that. And for that reason, we're the only avenue forward for this project, right? I mean, if there was an existing contract, and NWE and Pacific Northwest could have voluntarily entered into the interconnection agreement still, and it would have – all of this would have fallen under the voluntary contract mode. That's where Northwestern was put, you know, between the proverbial rock and the hard place. Because had it then ignored the commission's orders with respect to that, it would have been able to recoup the excess cost that the commission said it was concerned about, because the cost of that power is excess of the avoided costs. And so if Northwestern had voluntarily – You had applied for the suspension, according to Judge Forrest's question. Why did you sign these contracts then, knowing you had a petition pending to suspend the rate? That's because, as stated, you know, by the – in the hearing with the commission, Northwestern believed at that time that there were some projects that were far enough along that it could go ahead with – and it actually asked, during the hearing to the commission, that these contracts, including the Pacific Northwest solar contracts, be excluded from the suspension. And that's why it did what it did. I guess I'm trying to understand, because if, let's say, you must have existing contracts under the prior rate that you petitioned for suspended that you're continuing to honor, right? I mean, it's clear under the statutory scheme that once you have a contract in place, just because the rate is lowered in the future doesn't mean you stop paying your contractually agreed-upon rate, right? So then what distinguishes the four contracts I issue here from all those other preexisting contracts that there's no question that they continue to be legal and you continue to pay the prior rate? The distinguishing feature, I think, is the contracts themselves have conditions precedent in them. It is – just because you have the signed power purchase agreement does not mean you actually have the right to go forward and sell power to the utility. There are – in fact, in the power purchase agreements, there are a number of additional steps that you have to go through, including getting the interconnection agreement. And so there's a lot of – and that takes time. It's frequently another year, possibly, before you get to the interconnection agreement stage. Did anything preclude Northwest Energy from voluntarily entering into the interconnection agreement that would have satisfied those conditions? Again, there's probably no preclusion of actually entering into the interconnection agreement itself. The preclusion is paying the rate, the tariff rate, and that's the intervening feature. There's nothing – I mean, nobody – there was no order saying you can't enter into an interconnection agreement. The order said you can't pay that for the power unless you have both the PPA and an interconnection agreement by a certain date. I think I understand. Thank you. Thank you, Judge. We just simply ask that you reverse on the issue of impossibility as a matter of law. Thank you. The case of Pacific Northwest Solar versus Northwestern Corporation is submitted. Thank you both for your oral argument presentations today. I'll just – before I finish the docket, note that you're here from Kansas City. So good luck to you and your team this weekend. The last two arguments, Joshua Leon Worrell versus Kilyo Kijazaki, and the case of Julie M. Nelson versus Kilyo Kijazaki-Kazi are submitted on the briefs. And so that concludes our calendar for today. We are adjourned. Thank you very much. Please rise. This session of the court stands adjourned. Thank you.
judges: MURGUIA, FORREST, SUNG